In the Matter of the Application of EMMETT S. HICKMAN Co., for the DIAMOND STATE TELEPHONE COMPANY.
On the Petition of SIDNEY S. ROWEN and STEVEN L. FORTUNATO.

(*November* 4, 1954.)

SOUTHERLAND, Chief Justice, BRAMHALL, Justice, and HERR-MANN, Judge, sitting.

*Irving Morris* (of Cohen and Morris) for appellants.

16

*Richard F. Corroon* (of Berl, Potter and Anderson; *David F. Anderson* and *Januar D. Bove, Jr.,* Solicitor for the City of Wilmington, with him on the brief) for the Diamond State Telephone Company.

Supreme Court of the State of Delaware, No. 17, 1954.

SOUTHERLAND, C. J.:

The Diamond State Telephone Company is a public utility corporation of this State. It wishes to expand its facilities by the erection of an office building and a telephone exchange upon a block of land in Wilmington bounded by Thirty-ninth, Fortieth, West and Washington Streets. It does not own this land outright, but has contracted to buy it.

It applied to the Building Inspector for a permit. He refused it because the proposed construction conflicted with provisions of the Wilmington Zoning Ordinance. The Company appealed to the Board of Adjustment. A hearing was held, objections were heard, and testimony was taken. The Board's decision was to grant the application. The objectors appealed to the Superior Court, which affirmed. This appeal followed.

The question before us concerns the proposed establishment of a parking lot in a residential district. The facts are these:

A portion of the block of land in question is zoned as a Business A District. Upon this portion the office building will stand. This is a permitted use. The rest of the block is zoned as a Residence B District. Upon this portion will be built the exchange. This is also a permitted use. The two buildings will be joined. Adjacent to the exchange, and within the Residence A

District, the Company wishes to establish a parking lot serving 55 cars to be used by its employees working in both buildings and by its customers. Neighboring property owners object. The question before us is whether the action of the Board with respect to the parking lot is authorized by the provisions of the zoning ordinance.

Before proceeding to the merits, we must deal with a preliminary question.

In the court below appellants sought a reversal of the Board's order on the ground that the notice of appeal to the Board did not specify the grounds thereof, as required by 22 *Del. C.* § 324. It does not appear that this question was ever raised before or at the hearing before the Board. If it had been seasonably raised, the Board could and should have enforced compliance with the statute. We think the matter a procedural one, although there is authority to the contrary. See the cases cited in Yokley, *Zoning Law & Practice*, § 122. We do not look with favor on such an objection, made for the first time after a full hearing has been had and no prejudice to appellants affirmatively appears. We decline to void the proceedings upon this ground. We say, however, that the Board itself ought to insist upon compliance with the statute. Non-compliance contributes to inadequacy of the records of the proceedings—a matter we have twice before noticed. See *Searles v. Darling*, 46 *Del.* 263, 83 *A.* 2d 96; *Auditorium Inc. v. Board of Adjustment, etc.*, 8 *Terry* 373, 91 *A.* 2d 528.

We turn to the merits.

The Board of Adjustment, in granting the Company's application, apparently based its decision upon three grounds: first, upon a finding of unnecessary hardship justifying a variance under Section 14 of the zoning ordinance; second, a finding that the convenience and welfare of the public would be promoted, under Section 14(h) of the ordinance, relating to public utilities; and, third, upon a finding that the parking lot was an accessory use, under Section 3(1) of the ordinance.

The case was reviewed on *certiorari* by the Superior Court. That court agreed with the Board that the proposed parking use was accessory to the main use—the exchange. In so far as such use was accessory to the office building in the business district, the court was of opinion that the Board was within its powers in granting a variance in this respect.

It will be convenient to consider first the matter of accessory uses.

The Wilmington Zoning Ordinance, as is customary, creates for zoning purposes various classes of districts. Section 3 provides that within any Residence District no building or premises shall be used, in any part, otherwise than for nine specified classes of purposes. A parking lot is not one of them.

Paragraph (g) specifies the following class of permitted uses:

"Railroad passenger stations and rights-of-way, not including yards or sidings (other than passing tracks) and not including buildings other than passenger stations, telephone exchanges."

Paragraph (i) provides in part:

"Accessory uses, customary with or incidental to any of the aforesaid permitted uses, including private garages and private stables as hereinafter specified; * * *".

Paragraph (i) also provides:

"No business, service or industry, except operations incidental to farming carried on on the same lot, shall be conducted in any accessory building, nor shall any walk or driveway giving access to any business, service or industrial establishment, or any advertising sign, constitute a permitted accessory use; except as herein specified."

Appellants' first contention under this section of the ordinance is that a parking lot is specifically banned by the language of Section 3(i) prohibiting driveways. Every parking

lot, appellants say, is a driveway, "though every driveway is not a parking lot". A driveway is certainly not a parking lot; and we think it equally clear that a parking lot is not a driveway. The one imports the idea of vehicles not in use; the other the idea of cars coming and going—delivering passengers or goods and departing. We think there is no substance to this argument.

Appellants' second objection is that a parking lot, whether for employees or customers, is not an accessory use, because neither "customary" nor "incidental" to the main use—the telephone exchange. The Company replies that such an accessory use is both customary and incidental; and even if not "customary" it is certainly "incidental". The phrase is in the disjunctive, says the Company, and should be construed as written.

What is the proper construction of the phrase, "customary with or incidental to"?

If the language is read literally—in the disjunctive— any use that is "incidental", that is, subordinate to and related to the main use is permitted, no matter how unusual. This is a disturbing result. It seems contrary to a policy fundamental in zoning law—the preservation of the true character of the neighborhood. 1 Yokley, *Zoning Law and Practice*, § 11; *cf.* 22 *Del. C.* § 303. To preserve that character, an accessory use should be limited to what is usual—that which, in the light of experience, a nearby property owner may reasonably expect to find on his neighbor's property. Such a standard is reasonable and is readily applied. But "incidental", standing alone, is a word of vague and far-reaching import. In practice, its application might well permit a property owner to establish uses that would eventually impair the character of the neighborhood—a result clearly contrary to the intent of the law-makers.

On the other hand, if Section 3(i) is read as permitting such uses as are "customary with and incidental to" the main use, possible unfortunate results are voided, and—what is also persuasive—the ordinance is brought into harmony with the general law upon the subject.

■ In determining whether a use is "accessory", the almost universal test applied in zoning law is whether it is customarily incident to the main use. Yokley, *op. cit.*, § 64, says:

"Incidental uses have always been authorized where they are customary and do no violence to the plain intent of the statute or ordinance."

Most of the zoning laws or ordinances in defining accessory uses appear to use the phrase: "customarily incident to". Reported cases construing a zoning ordinance containing language like that of Section 3(i) are few. In *Dolan v. De Capua*, 13 *N. J. Super.* 500, 80 *A.* 2d 655, the court had before it an ordinance like that of the City of Wilmington, permitting "accessory uses, *customary or incident to the above uses.*" Though the question of construction was not directly raised, the court treated the phrase as though it were in the conjunctive. It posed the question as follows:

"The problem for resolution is whether or not this use is a customary use as intended by the zoning ordinance."

Its conclusion was that the proposed use was "not one customarily incident to" the permitted use.

■ It is well settled that the disjunctive "or" in a statute or ordinance may be read as "and" if to do so will conform to the legislative intent. This rule of construction has resulted from the common and careless use of the words in legislation. Crawford, *Statutory Construction*, § 188.

■ We think the rule applicable here. To construe the statute literally is to leave the Board of Adjustment without any safe standard in determining the extent and character of accessory uses; whereas the alternative construction brings the ordinance into harmony with the underlying legislative intent.

We hold that an accessory use, to be permissible, must be one "customary with *and* incident to" the permitted use.

Now, the parking lot, as accessory to the exchange, is (as we read the Board's findings) to be for the use of both employees and customers. We take judicial notice that parking space for customers is now a usual adjunct of new commercial buildings in areas in which land is available for the purpose. But parking for employees working in such buildings is another matter. Certainly it is not yet sufficiently widespread for us to notice judicially its existence. Sufficient evidence to that effect would be required as a prerequisite to the Board's determination that such a use is customary.

Since the record before us contains no such finding, the Board's holding that a parking lot for both employees and customers is a use accessory to the exchange cannot be sustained. Whether the deficiency of the present record may be remedied by additional testimony and findings is a question we deal with hereafter.

Appellants' next contention concerns the use of the parking lot as accessory to the office building. The Company wishes to afford parking space to the employees and customers of that building also. To that extent the lot will become an accessory to a main use not permitted in a residential district. Is this proper?

The situation in this case appears novel. The exchange may properly establish in a residential district a parking lot for its customers (if there are such— we do not know), and also for its employees, if such use can be shown to be a customary one. But it does not follow that such permitted use may be expanded to serve adjoining property in a business district. It seems clear that a parking lot could not be established in a residential district as accessory solely to property in a business district in the absence of facts justifying a variance. *Texas Consolidated Theatre, Inc., v. Pittillo, Tex. Civ. App.,* 204 S. W. 2d 396; *Brackett v. Board of Appeal,* 311 *Mass.* 53, 39 N. E. 2d 956. To the extent, therefore, that the parking lot would serve the employees and customers of the office building, it would appear to violate the zoning law.

To justify the action of the Board, the Company makes two contentions. The first is that the use of the parking lot by employees and customers of the office building does not change the character of the permitted use and hence constitutes no added detriment to neighboring properties. A parking lot is lawful; therefore, says the Company, its use by the employees and customers of the office building does not change the character of the lot or subject it to any burden more detrimental to neighboring properties than that already permitted.

(For convenience in discussing this contention we shall momentarily lay aside the distinction we have made between the use of a parking lot for employees and its use by customers. If parking for employees is not a customary use, the observations below will have even greater force.)

Now, on its face (especially if we assume for the moment that parking for employees is customary) the Company's argument has some appeal.

If a parking lot is permitted, what difference does it make if it is used by others of the same class of persons as those already permitted to use it? But on examination difficulties appear. In the first place, the size of the required lot is necessarily increased to some extent. There are no facts in the record to show the number of users attributable to the exchange and the number attributable to the office building. It may be inferred that the latter is the larger, since the business office of a telephone company attends to customers wishing to pay bills in cash. Presumably an exchange has no "customers"; at least that conclusion seems highly probable. If it is correct, we are concerned with the establishment of a parking lot for employees of the exchange and employees *and* customers of the office building.

In the second place, it is one thing to establish a parking lot presumably used largely for employees who arrive in the morning and leave in the evening. It is another thing to invite its use by customers who are coming and going during the day,

thus giving to the neighborhood the appearance of commercial activity resulting from a use not permitted in a residential district. To that extent the character of the use is changed.

It may be said that all this rests upon inference. So it does. But whose fault is it that the facts do not appear? To support its contention that the use of the parking lot as accessory to the office building will not change the character of its use, the Company could have submitted figures showing the facts. It is possible that if these figures had shown that the extension of the use of the parking lot would not substantially affect the size of the proposed lot and that the number of probable daily customers of the office building would be very small, the Board might have found as a fact that the additional burden or detriment to the neighboring properties would be so slight as to be negligible. This possibility appears unlikely, but we do not know the facts. The point is that no effort was made to present the facts. The Company's contention on this point comes to this: if a parking lot is permitted as a use accessory to the exchange in a residential district, it is permitted as a use accessory to a nearby office building in an adjoining business district under the same ownership. As the matter was presented to the Board, the Company was attempting to do indirectly that which it could not do directly—use residential property as an accessory to a business use in a business district. This it could do only if it could show that the expanded use for which it sought permission did not, as a matter of fact, work any substantial change in the permitted use. No such showing was made. Hence on the record before us the Company's first contention must fail; and this result follows even if it be assumed (a fact not established) that parking space for employees of the exchange is a customary use.

Its second contention is that the Board's action was justified by the provisions of Section 14 of the Zoning Ordinance; first, under paragraph (h) relating to property of public utility corporations, and second, under the Board's general power to grant variances.

Section 14 provides in part:

"A Board of Adjustment, constituted in accordance with the provisions of law, shall have the powers specified in An Act Granting to Municipalities of Delaware Authority to Adopt Zoning Regulations, approved March 14, 1923, and any amendments thereto. Its procedure shall be governed, and its duties defined, in accordance with the provisions of such aforesaid act, and by such rules and regulations as it may adopt for its proceedings, in conformity with such act.

"Any person aggrieved or affected by any decision of the Building Inspector may appeal from such decision to the Board of Adjustment, as provided by law and by the rules of such Board. Notice of appeal shall be given in writing to the Building Inspector and to the Board, within such period as the Board may by general regulation prescribe. Such Board may, in particular cases where unnecessary hardship would otherwise result, authorize variance from the terms of this Ordinance in harmony with its general purpose and intent, and with the public interest; and for these purposes and within these limitations, in accordance with powers already enumerated or granted it by law, shall have the following authority: * * *".

Then follow nine lettered paragraphs. Paragraph (h) is as follows:

"(h) To vary any provision of this Ordinance in so far as such provision shall apply to any lot or structure which is the property of a public utility corporation, in cases where the convenience and welfare of the public are shown to be promoted by such variance; which shall be exercised only after public hearing and in definite and limited terms;".

The Board appears to have made a finding that public convenience, as well as other considerations, including unnecessary hardship, justified its action under Section 14. Presumably paragraph (h) was, to some extent, relied upon. The Company contends that under paragraph (h) unnecessary hardship need not be shown.

Paragraph (h), it says, is to be construed not as a variance but as an exception, containing its own standard of application—the promotion of the convenience and welfare of the public. An exception, unlike a variance, requires no finding of unnecessary hardship, and the distinction between the two, the Company says, is made in the enabling act upon which the Wilmington ordinance is based.

It is quite correct to say that, generally speaking, an "exception" in zoning law is not the same thing as a variance. Yokley, *Zoning Law and Practice*, § 133; *Application of Devereux Foundation, Inc., Zoning Case*, 351 *Pa.* 478, 41 *A.* 2d 744, 746. In the cited case the Supreme Court of Pennsylvania said:

"An 'exception' * * * is one allowable where facts and conditions detailed in the ordinance * * * are found to exist."

In the case of an exception, the law itself has foreseen the possibility that a departure from its provisions may be desirable if certain specified facts or circumstances are found to exist. A variance, on the other hand, involves an overriding of the law itself, based upon a finding that the law as written would inflict unnecessary hardship on the property owner.

This distinction is clearly made in our enabling act. 22 *Del. C.* § 327. Unfortunately, Section 14 of the Wilmington Zoning Ordinance not only fails to preserve it, but is confusingly drawn. Of the nine lettered paragraphs referred to two—(a) and (e)—have nothing to do with exceptions or variances. The other paragraphs, except paragraph (h), are couched in language more appropriate to exceptions than to variances. Paragraph (h), with which we are here concerned, uses the words "vary" and "variance", although it deals with a special class of property owners and purports to set forth a special standard—the promotion of public convenience and welfare. The paragraph seems to embody an exception rather than a variance.

The Company's argument is that Section 14 is badly jumbled and its language confusing, and that it should therefore be construed in the light of the provisions of the enabling act, and

the distinction between variances and exceptions read into it. So construed, it is said, paragraph (h) becomes an exception contemplated by § 327 (a) (2), as to which no finding of unnecessary hardship is required.

We can at once assent to the Company's suggestion that the section is badly drawn and its language confusing. But we are not at liberty to examine this contention further. We think that such an inquiry is foreclosed by our decision in *Searles v. Darling, supra.* That case concerned paragraph (d), which permits the change of a nonconforming use to another not more detrimental to the neighborhood. It was held that the power of the Board under paragraph (d) was limited by the preceding language in the second paragraph of section 14 respecting variances; and that unnecessary hardship must be shown. We can perceive no difference for our present purpose between the two paragraphs. If paragraph (d) requires a finding of unnecessary hardship, so likewise does paragraph (h), for if the language of the second paragraph of Section 14 applies to the one it must apply to the other. The holding is squarely in point here.

The Company argues that this result is unreasonable. If, in addition to a showing of public convenience and welfare, it is required also to show unnecessary hardship, a paragraph apparently designed to provide for special treatment of property devoted to a public use is transformed into one imposing burdens in respect to variances more onerous than those imposed on property owners generally. This argument has force; but it must yield to the other language of Section 14 and to the construction placed upon it in the *Darling* case. It is true that the contention made in this case was not made in the *Darling* case. The matter was presented to the Court as an application for a variance. But the construction of Section 14 adopted in that case is certainly a possible one. The holding is one affecting local property rights in land, and under the rule of *stare decisis* it should be followed. *Daniels v. State,* 2 *Penn.* 586, 48 *A.* 196, 198, 54 *L. R. A.* 286.

The Company must therefore show unnecessary hardship. The Board found it to exist, and the Superior Court approved.

The facts are not in dispute. Do they justify the finding?

It is first to be noted that the property here involved—that portion of the block in the residential district—was bought (or contracted for) long after the zoning restrictions were placed upon it. It is the case of a purchaser who buys property, knowing it to be subject to zoning restrictions, with the hope that they may be relaxed for his benefit. This fact is not in itself a complete bar to his application, but it tells against him from the start. *Searles v. Darling, supra.*

It is next to be observed that the record of the findings of the Board upon this matter is somewhat less than satisfactory. The conclusion of the Board is stated: "The appellant has shown hardship." But the facts appear only inferentially. The paragraphs preceding the finding are mostly in the form of recitals of testimony given before the Board. So far as pertinent to this point, they appear to relate (1) to the additional financial burden that would be imposed upon the utility in locating its project elsewhere; and (2) to the public need for a telephone exchange and office building in the Ninth Ward of the City of Wilmington. We assume that this testimony was accepted and the facts so found. Even so, it is wholly insufficient as a showing of hardship. Nothing is better settled than the fact that economic advantage alone does not justify a variance. *Searles v. Darling, supra.* Nor is a public convenience a deciding factor, although it might in some cases have weight. It is the uniform rule that the circumstances must be peculiarly oppressive to the applicant's property, and that the hardship must relate to the particular property for which the variance is sought. *Searles v. Darling, supra.* In that case an owner of an appartment house wished to erect a garage in a residential zone as an accessory to a nearby apartment. The court held that the hardship asserted was suffered by the apartment house—not by the residential property. So here, the supposed hardship falls upon

the adjoining property—the office building—not upon the exchange. It is suggested that hardship falls upon the owner of the parking lot because it is prevented from making full use of the land as a parking lot. On the contrary, it is permitted to make full use of it as accessory to the exchange, to the extent that the use is a customary one. But, for the reasons heretofore given, it may not expand that use for the benefit of other property in a business district, even though it owns that other property.

In the light of the foregoing, it is clear to us that the case was not one of a discretionary exercise of the Board's power; the facts on which discretion must be predicated did not exist.

The result seems to be unusual. The owner of a parking lot may use it, to the extent above set forth, as an incident of part of his business but not for another part immediately adjoining. Difficulty may arise in so confining its use, but that difficulty may be more apparent than real. Appropriate restrictions upon the size of the lot, based upon the probable number of users, should afford a means of dealing with it. At all events, we see no way of avoiding the result.

It follows from what we have said that the judgment of the Superior Court and the order of the Board of Adjustment must be reversed. The cause will be remanded to the Superior Court, with instructions to vacate its judgment and remand the case to the Board of Adjustment for further proceedings in conformity with this opinion. Since the proper construction of Section 3(i) has not heretofore been settled, the Company should be given leave, if it so desires, to take appropriate proceedings to supplement the record with respect to the subject of parking for employees. If the company elects to take no further action the Board should, by appropriate proceedings, modify its determination so as to conform to the principles laid down in this opinion.